NOT DESIGNATED FOR PUBLICATION

No. 123,939

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of H.Q.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KELLIE HOGAN, judge. Opinion filed November 19, 2021. Affirmed.

*Jordan E. Kieffer*, of Jordan Kieffer, P.A., of Bel Aire, for appellant natural father.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before ARNOLD-BURGER, C.J., HILL and WARNER, JJ.

PER CURIAM: Father appeals from the termination of his parental rights over H.Q. The primary basis for the district court's termination of Father's parental rights was Father's plan to rely on Mother, who the district court found to be unfit, for childcare. Because the record supports the district court's finding that Mother was an unsuitable caretaker for H.Q. and Father failed to pursue alternative childcare arrangements—although encouraged to do so for over a year—the district court's decision to terminate Father's parental rights is affirmed.

FACTUAL AND PROCEDURAL HISTORY

H.Q. was born in early 2019 and the State filed a petition alleging that H.Q. was a child in need of care shortly thereafter. H.Q. is the only child that Mother and Father

1

share. The focus of this case is Father's parental rights over H.Q. However, some information about Mother and Mother's other children is necessary for context.

At the time of H.Q.'s birth, Mother had four daughters in State custody—L.J., T.G., A.V., and A.R. The girls entered police protective custody in July 2017 after the police conducted a welfare check at Mother's home. The children were dirty. The home was cluttered and dirty and it smelled like feces. The kitchen was infested with cockroaches and other insects. T.G. had a soiled diaper with a cockroach inside. A.V. had a soiled diaper, feces in her hair, and fresh feces on her shirt. A.R. also had a soiled diaper. The children were placed in the temporary custody of the State and the district court ordered Mother to complete various case plan tasks including obtaining a clinical interview, abstaining from drugs, maintaining employment, finding housing, and completing parenting classes.

From the beginning of the case, it was apparent that Mother had some cognitive issues. Case workers would ask Mother for things multiple times, like pay stubs or utility bills, and Mother would forget to bring them. Mother was expected to bring everything she needed to care for her children during visits, including food and activities. But she sometimes forgot to bring these things. The girls' foster parents would pack a backup meal in case Mother forgot, which was not typical according to Mother's case worker.

Heather Smith, a family support worker at Saint Francis, was assigned to the family's case from July 2017 through November 2019. Smith said she discussed age-appropriate activities for the children with Mother multiple times and Mother would seem to understand, but then by the next visit Mother would have forgotten what they talked about. The food that Mother brought was often insufficient in quality or quantity. For example, once she brought the girls each one taco from Taco Bell; another time she had them share a large order of French fries from McDonalds. Another time she brought two cheeseburgers and one order of French fries and had the girls share them. Mother said she

did not have enough money to provide adequate food. Case workers discussed cost effective foods with Mother multiple times and simplified it as well as they could. They broke down the costs of homemade food, like peanut butter and jelly sandwiches with fresh fruit or vegetables, versus the costs of fast food. Mother would say that she understood but she would continue to exhibit the same behaviors and bring the same things. The case workers believed that mother "desperately need[ed] to complete a nutrition class so she [could] understand the importance of providing nutritious and healthy meals for her daughters."

The case workers who observed Mother's visits with her children also had concerns about her ability to parent in other ways. Camille Cortez, who was assigned to Mother's case from August to October 2018, noticed that Mother failed to correct or redirect the children's behavior and that it was difficult for Mother to focus on more than one child at a time. Smith believed Mother's inability to supervise all of the children at once raised safety concerns because the children could get injured or run off. She also noted that Mother failed to set appropriate boundaries for the children or redirect them when they misbehaved. Troy Daugherty, a case manager assigned to the family between November 2018 and September 2019, had similar concerns. He believed "the children were not being parented very much during those visits and kind of just did whatever they pleased." For example, they would run around, throw items, make messes, and fail to pick up after themselves and Mother would not do anything about it. Smith spent "a lot of time during these specific visits to help Mother with parenting skills, trying to teach her, show her how to keep all of the children kind of under control during visitations."

Despite these issues, Mother's case workers decided to progress her visits with the children at Saint Francis from supervised to monitored in early 2018. Smith saw minimal changes in Mother after the visits changed to monitored. While Mother could focus on one concept per visit, such as not letting the children spin in a swivel chair, she did not progress overall in addressing the children's chaotic and rowdy behavior.

3

Over a year after the children entered State custody, Mother's case workers were "unsure if [Mother would] cognitively be able to care for all of her children." At that time, the case workers were "unsure if [Mother] need[ed] to be taught the same thing multiple times in order for her to learn if that is the way to do it or if [Mother] is just too low functioning to care for her children." Mother's case workers recommended that Mother obtain a psychological evaluation to determine Mother's mental capacity.

The evaluation occurred over two appointments with Dr. Derek Parker. Case worker Daugherty made the appointments for Mother because he was not sure if she was capable of following through with scheduling it on her own. Mother did not have a driver's license, so Daugherty also drove her to the appointments. It concerned Daugherty that Mother did not have a driver's license because parents need reliable transportation.

Dr. Parker administered a battery of tests to Mother and prepared a report. The evaluation revealed the Mother had difficulty retaining short-term memories and converting them into long-term memories. While the memory impairment made it difficult for Mother to hold and manipulate new information, Dr. Parker concluded that "[d]eficits in cognition do not necessarily inhibit her ability to adapt to domestic life, given the opportunity to learn . . . . [Mother] is able to learn with repetition."

This was the state of things when Mother informed Saint Francis that she was pregnant with H.Q. The news concerned Smith because Mother was already having a difficult time parenting, and the addition of an infant could make things more difficult. Mother said she wanted Father to start attending visitation with her and her other children. Smith began working with Father and H.Q. in January 2019 after H.Q. was born. Mother and Father married in early 2019 and maintained a home together which case workers believed was appropriate for reintegration.

4

The district court held a temporary custody hearing in February 2019 and ordered H.Q. to remain in the temporary custody of DCF in an out-of-home placement. In May 2019, Mother and Father each entered a statement of no contest to the child in need of care (CINC) petition. The district court found that H.Q. was a child in need of care.

During these initial months of Father's participation in the CINC case, Mother and Father had monitored visits with the children at Saint Francis. They had three visits per week—two with H.Q. and one with all five children. Father could not make it to all of the visits with H.Q. because he was working.

Smith believed that Mother "had a difficult time" parenting newborn H.Q. Smith had to help Mother prepare a bottle and determine how much formula to add to the water. Mother wanted to feed H.Q. at every visit and "had a difficult time knowing when he was hungry and when he was not hungry." Smith discussed this with Mother and Mother would seem to understand, but then Mother would do the same thing the following week. The "theme" to Mother's parenting, according to Smith, was that week after week Mother had to be reminded of things that had already been discussed and that she had difficulty completing new tasks.

Smith believed visits became more chaotic after H.Q. was added. Despite this, visitation progressed into supervised visits at Mother and Father's home in June 2019. Once the visits moved into the home, Father was able to attend all of them. Moving the visits into the home also added to the chaos that had become characteristic of the visits, according to Smith. Visits were more difficult because, instead of being contained in one room at Saint Francis, the children had multiple rooms to go into. Smith said it was hard to supervise the children because "[t]hey were just all over the place." The children would not listen to Mother when she summoned them or asked them not to jump on the bunk beds. Father "did do a better job of keeping track of the children." He would corral the children and get involved if they were doing something unsafe. If Mother had been alone

5

with the children, Smith did not think that Mother "would be able to provide safety for them" and "to be able to watch all of them all at one time."

Mother was not overfeeding H.Q. as much when visits moved to the home and she and Father began preparing appropriate meals for the children. But after a few visits, Smith had many of the same concerns she had when visits were in the office. Smith was still worried for the children's safety due to their jumping on furniture and roughhousing. Further, she was concerned with the general lack of supervision during the visits. Smith continued offering coaching and solutions to Mother. Smith thought it was "very difficult for [Mother] to understand, remember conversations that we had about the concerns."

During the visits, Father mainly focused on H.Q. and not the other four children. Saint Francis workers encouraged Father to discipline the girls as if they were his own children because he would be serving as a father figure for all of the children if they reintegrated. Father had not realized that it was appropriate for him to discipline another person's children, but after discussing it with case workers Father was receptive to the idea. After this discussion, Father progressed in parenting the children. He was more successful in getting the girls' attention and getting them to listen when he tried to discipline or redirect them.

Despite the improvements that followed the discussion with Father, Smith maintained her overall concerns about reintegration. The main concern stemmed from the fact that Father planned to leave the children with Mother while he worked and Mother's ability to parent the children and keep them safe. Smith spoke with Mother and Father about finding an appropriate relative that could help with childcare when Father was not available, but they did not find anyone who could assist. The case workers cautioned Mother and Father that because Mother would be the primary caregiver while Father worked, Mother would have to demonstrate proper parenting.

6

The State moved to terminate Father's parental rights as to H.Q. and Mother's parental rights as to all five children in August 2019. In a court report prepared shortly before the motion to terminate was filed, Daugherty stated that "[Mother] and [Father] have done a good job completing court orders, but simply seem incapable of parenting the children." At the termination hearing, Daugherty added that while Mother and Father completed case plan tasks, they "did not demonstrate that they got the usefulness out of those tasks that they needed."

Though the State filed its motion to terminate in August 2019, the termination hearing did not begin until November 2020. Visitation continued in the interim. Leanne Wonser, a permanency specialist with Saint Francis, took over the family's case in September 2019. Like the other case workers involved with the family, Wonser believed Father did well interacting with and monitoring the children. Mother, on the other hand, struggled with managing all of the children at once. This had "implications for safety of the children should [Father] not be present to oversee and monitor the children."

A visitation report prepared in October 2019 noted that Father showed "appropriate supervision and parenting skills as to all five children during visits." Mother was "able to supervise and parent one child at a time, but it continue[d] to be difficult for her to parent all five." Visits with all five children were still supervised in the parents' home. Case workers wanted to progress the visits to monitored, but L.J. expressed discomfort with being left alone with Mother and Father. Saint Francis made a referral for family therapy to help the children feel more comfortable. Visits with H.Q. had already progressed to monitored in the home.

Concerns about domestic violence between Mother and Father arose in January 2020. According to Wonser, Mother arrived early to a case plan meeting with her sister and a friend. She then disclosed to Wonser that Father had been physically aggressive with her that weekend. Mother had several injuries, including a grapefruit-sized bruise on

her leg, scratches on her neck, and a distinct handprint bruise on her inner thigh. When Wonser asked Mother if Father had been this aggressive before, Mother said, "'Not this bad.'" Wonser asked if Mother feared for the children, and Mother said she did not think Father would hurt H.Q. but he might hit the girls. Wonser advised Mother to file for a protection from abuse order, but Mother never did.

Domestic violence concerns arose again in the spring of 2020. Mother met with Wonser and recently assigned family support worker Tate Strasner. Strasner questioned Mother about a bruise that he observed on the left side of her face. Mother explained that her sister's daughter bumped her at a birthday party three days earlier. However, the case workers had not observed the bruise the previous day at visitation. When the case workers called Mother's sister to attempt to verify the story, the sister said she had not seen Mother for more than two weeks. After this, Mother called the case workers to say she was confused when talking to the case team and it was actually her other sister's daughter who bumped into her. Mother added that Father had "not laid hands on her since April." Strasner asked what happened in April. Mother said Father "had gone to hit her but she 'put a stop to it.'" Strasner called Mother's other sister but was unable to validate Mother's story.

The next incident that concerned workers was in September 2020. Mother and Father arrived at a case planning meeting in separate vehicles. Mother said this was because she had an appointment after the meeting. Mother had a large bruise, about the size of a softball, on the left side of her neck and a vertical line of faint bruises on the right side of her neck. Strasner believed the bruises looked like they were made by a hand. Mother described these as "romantic bruises" and said she was doing well with Father. Mother also had a three-inch scrape on her leg. Mother said she got the scrape when she fell while running. However, in later visits Strasner heard Mother tell the children that she could not run because she had asthma.

In a following visit, Strasner noticed that Mother's glasses were missing and she had a scrape above her eye. Mother told Strasner that she was at her niece's birthday party at a playground when a boy ran up and kicked her in the face, breaking her glasses. Later, Strasner heard her tell the children that she was going down a slide face-first and a boy did not see her and ended up hitting her and breaking her glasses. He attempted to validate Mother's story with Mother's sisters but could not get in contact with them.

At the termination hearing, Mother testified that Father had never engaged in domestic violence against her. She denied reporting to case workers in January 2020 that Father hit her, explaining that it was her sisters who made the report because they did not like her. Mother said she denied her sister's allegations that Father engaged in domestic violence. She also said she did not recall sharing her fear that Father may be aggressive toward the girls. Despite her denials, Mother acknowledged that she had an altercation with Father and went to stay the night with her mother. While she was asleep her sister took pictures of some injuries Mother had, but Mother did not recall how she got those injuries. Father also denied the existence of domestic violence in the home. He said that Mother got the injuries observed in January 2020 when they were arguing, and she ran away and fell.

Following the domestic violence allegation in January 2020, visits reverted to supervised visits at the Saint Francis office. Visits remained supervised until the time of trial at the end of 2020.

Strasner supervised his first visit with the family in February 2020. He described it as "chaotic." Strasner explained: "Generally, the children will run all around the room, climb on the furniture, food will be spilled or thrown, and they won't listen to instruction. Boundaries aren't set and followed through with, so the children continue throughout the visit generally with their chaotic behavior." At that particular visit, the children were fighting over a toy and there was potential for a child to be hurt on the toy. Mother and

9

Father asked the children repeatedly to get off the toy, but the children would not and the parents failed to set consistent boundaries. One of the children ended up falling off of the toy.

Due to the COVID-19 pandemic, visits occurred over the phone from March 2020 to May 2020. They returned to the Saint Francis office for just over a month, and then went back to phone visits due to COVID-19 at the end of June 2020. In-person visits resumed in August 2020 and were conducted at a local park.

When visits changed to phone calls, the girls began exhibiting more hostility toward Mother and Father. The girls frequently expressed that they did not want to be with Mother and Father, that Mother and Father are not their parents, and that they hate Mother and Father. Mother tried to engage the children to the best of her ability, Strasner reported, but the girls returned her advances with hostility. When visits returned to in-person this behavior continued. Strasner did not hear "a single positive response or desire regarding visitation with their parents" from the girls. He consistently heard them say that they did not want to visit and that they just wanted the visit to be over.

During 2020, the girls also began getting physically aggressive with Mother and Father by doing things like hitting, slapping, and kicking them. The aggression peaked when face-to-face visits resumed in August 2020.

Father was very quiet during the visits that Strasner observed, and he spent a majority of his time with H.Q. He made some attempts to engage with the girls, but the girls were not receptive.

Strasner had several concerns after observing Mother and Father at visitation. He thought that Mother and Father "seem[ed] to struggle with setting and maintaining boundaries." The children would jump on furniture, throw and spill food, and grab

fistfuls of dirt and throw them at the parents. Overall, Strasner did not see "a single visit where there's no misbehaving" or "a single visit where there's quiet playing or where there seems to be a cordial, conductive relationship between the parents and the children." This was a stark contrast to Strasner's observation of the children in their foster home. Wonser also observed the children in the foster home at least eight times and described them as "[v]ery settled and calm."

Strasner also worried about the safety of the children at visits because they would run in different directions and refuse to stay with the group. Strasner found himself making a suggestion at least once per visit addressing safety concerns. He testified that he would "absolutely" have safety concerns if he was not present with visitation. He was not even prepared to move the visits to monitored. To change the visits from supervised to monitored, he said, the hitting and kicking would need to be addressed and there would need to be consistent boundaries put in place. The parents would also "need to learn to be more aware of what their children are doing and learn to keep them together."

Finally, Strasner had some concerns over the parents' management of the children's food. On several occasions, he saw the parents offer H.Q. food that was not age appropriate. There was an incident where H.Q. choked on a piece of chicken that was not cut small enough. The parents gave H.Q. other foods that presented choking hazards, like a Dorito chip and a whole slice of pizza. Strasner also thought the parents did a poor job monitoring how much food the children ate despite being asked to do so by case workers.

Strasner had "no doubt that these parents love their children." But he did not see any improvement in Mother and Father's parenting skills during the visits despite consistent coaching. The relationship between Mother and the children, in particular, seemed "irreparable at this point given the age of the children and their interactions with her."

11

The district court conducted a termination hearing as to the parental rights over all five children over two days in November and December 2020. Several case workers testified as to the facts of the case and their opinions on reintegration. Mother and Father also testified.

Valerie Kabutu, a therapist at Saint Francis, testified as to her observations of Mother and the children. She first assessed the Mother and the girls utilizing the Marschak Intervention Method over the course of five visits beginning in December 2018. During these visits, the children often misbehaved with limited boundaries or correction. After these visits, Kabutu's general concerns included safety, setting limits, and providing positive attention to the children. Kabutu provided a parent-child assessment in March 2020. After revisiting the family, Kabutu's concerns remained unchanged. The children misbehaved during the assessment, but Mother failed to correct or discipline them. Mother struggled to handle the children all together because she could not watch all of them at the same time. Kabutu was concerned that if the children were left with Mother for an extended period of time, Mother would not be able to safely care for them.

Marque Schulte, a licensed clinical master's social worker who works for a community mental health center, provided therapy to L.J. and T.G. Schulte saw the girls consistently over three years. Schulte did not believe the visits with Mother were beneficial to the girls' mental health.

Amanda Galloway, a reintegration supervisor at Saint Francis, worked on the case for the two years preceding the termination hearing. When Galloway took over the case, her concerns centered on Mother's ability to engage with and parent all five children during visitation. Galloway testified that none of her concerns regarding parenting had been alleviated during her time on the case and she did not think there had been any progression in parenting. Galloway's concerns with Father specifically were that he did

12

not engage with the girls during visitation and Mother's allegation of domestic violence against him.

Galloway was asked if she would have concerns reintegrating just H.Q. with Father. Galloway responded affirmatively because Mother resides with Father and would provide childcare, and Galloway did not think Mother should be left alone with him. She also worried about the domestic violence allegations. However, she did not think the parents were asked to take any domestic violence classes and had not seen anything added to the case plan that would address domestic violence.

Wonser, the family's permanency specialist from September 2019 to the time of the termination hearing, had similar concerns with Mother's capacity to parent, the allegations of domestic violence against Father, and Father's lack of relationship with the girls. Her biggest area of concern was supervision of the children and parenting capacity. Wonser also believed there was no improvement in parenting of the children since she became involved with the case. She was worried about "[t]he neglect of the children due to Mom's inability to adequately provide and supervise the children" if Father left the children with Mother while he was working. Wonser did observe a visit with H.Q. and said it went well. Both parents engaged with H.Q. and "it seemed that his needs were being met in that visit."

Strasner also testified as to his overall concerns about Mother and Father's ability to parent the children. Like the others, Strasner was concerned with the domestic violence allegations, the parents' ability to feed the children appropriately, and the parents' ability to supervise the children.

The district court entered an order terminating Father's parental rights in January 2021. The court found clear and convincing evidence that Father was unfit, citing K.S.A. 2020 Supp. 38-2269(b)(7) and (b)(8), and that his condition was unlikely to change in the

13

foreseeable future. After considering the physical, mental, and emotional health of H.Q., the court concluded that termination was in H.Q.'s best interests. The court also terminated Mother's parental rights as to all of the children.

Father appealed.

ANALYSIS

"A parent has a fundamental liberty interest in his or her relationship with the child, so the allegations of conduct that form the basis for termination must be proved by clear and convincing evidence." *In re R.S.*, 50 Kan. App. 2d 1105, 1115, 336 P.3d 903 (2014) (citing *Santosky v. Kramer*, 455 U.S. 745, 769-70, 102 S. Ct. 1388, 71 L. Ed. 2d 599 [1982]). If a child has been adjudicated to be a child in need of care, then a court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2020 Supp. 38-2269(a). After making a finding of unfitness, the court must consider whether the termination is in the best interests of the child. K.S.A. 2020 Supp. 38-2269(g)(1). In making this determination, the court must "give primary consideration to the physical, mental and emotional health of the child." K.S.A. 2020 Supp. 38-2269(g)(1).

When an appellate court reviews a district court's termination of parental rights, it should "'consider whether, after review of all the evidence, viewed in the light most favorable to the State,'" it is "'convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parents' right should be terminated.'" *In re K.H.*, 56 Kan. App. 2d 1135, 1139, 444 P.3d 354 (2019). In reviewing a district court's decision based on any clear and convincing evidence standard, an

14

"appellate court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact." *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

Father argues that the district court erred in finding that he was unfit, and his unfitness was unlikely to change in the foreseeable future. He also challenges the district court's holding that termination was in H.Q.'s best interests.

*The evidence, when viewed in the light most favorable to the State, supports the district court's finding that Father was unfit.*

Father first challenges the evidence supporting the district court's unfitness decision.

In support of its unfitness finding, the district court cited two factors from K.S.A. 2020 Supp. 38-2269(b). One was the failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family. K.S.A. 2020 Supp. 38-2269(b)(7). Here, the district court noted that Saint Francis made reasonable efforts to assist Father and gave him appropriate referrals for services. While Father did complete his case plan tasks and participate in services, his efforts had "not resulted in [F]ather's ability to provide adequate care for his child because he remains married to [Mother] who is unable to adequately parent a child." The court also relied on K.S.A. 2020 Supp. 38-2269(b)(8)—lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child. On this point, the court noted that Father was the primary income earner and intended to rely on Mother for childcare. But Mother "suffer[ed] from serious mental health diagnosis and a low IQ which limit[ed] her ability to provide minimal care for a child." The court also noted the concerns of domestic violence between Father and Mother as well as Father's passivity toward Mother's other four children during visitation.

15

The district court's finding that Mother is an unsuitable caretaker for H.Q. is supported by the record. There was ample evidence that Mother, through no apparent fault of her own, simply could not safely care for a child on her own. Those who worked on the case repeatedly testified as to this point. Mother allowed dangerous situations to exist numerous times, whether it was by giving H.Q. food that posed a choking hazard, failing to intervene when the children were jumping on furniture, or allowing the children in the kitchen when there was a risk they could touch a hot oven. Mother had the benefit of State assistance with parenting her children for more than three years. Yet, according to case workers, her parenting skills did not progress. Additionally, Mother's documented cognitive issues inhibited Mother's ability to make the necessary progress.

Father acknowledges that the district court's termination decision was largely based on Father's association with Mother, essentially finding "that Father was unfit by extension." Father's analysis on this point does not really address Mother's fitness, but rather summarizes the evidence showing that Father was fit. When considering the evidence as a whole, he argues, "there was very little evidence that Father was unfit or would be unfit for the foreseeable future."

It is true that there was a lot of positive evidence about Father at the hearing. There were no major concerns with Father's parenting skills or H.Q.'s safety when he was with Father. As the district court noted, Father completed his case plan tasks and participated in services. Father showed progress in his parenting of the girls after receiving instruction from case workers. He also helped watch the children and stepped in when they were doing something unsafe. Multiple case workers testified that Father loved H.Q.

But the district court also made note of its belief that Father had engaged in violence against Mother. The district court noted that Mother had reported Father had been violent towards her, and trained child services workers observed injuries to Mother

16

that they believed, based on their training and experience, were caused by domestic violence. The record also contains several observations of injuries to Mother in the 11 months preceding the hearing, with inconsistent, implausible, and untruthful explanations given by Mother, including Mother reporting on more than one occasion that Father caused some of the injuries and that he had hit her in the past.

The problem with Father's argument is that he essentially asks this court to reweigh the evidence. The district court placed significant weight on the testimony that Father's plan to leave H.Q. alone with Mother was unsafe. The district court acknowledged the efforts that Father made toward reintegration, summarized above, but found that these efforts were not enough so long as Father intended to rely on Mother for childcare. The district court also believed that the evidence supported a finding that Father had been physically violent with Mother. This court cannot reweigh the evidence.

When the evidence is viewed in the light most favorable to the State, a rational fact-finder could have found it highly probable that Father's parental rights should be terminated.

*The evidence, when viewed in the light most favorable to the State, supports the district court's finding that Father's unfitness was unlikely to change in the foreseeable future.*

Father also challenges the district court's holding that his unfitness is unlikely to change in the foreseeable future. He asserts that he "made progress over a sustained period, demonstrating a willingness to complete any task requested of him." His actions, he argues, "suggest that Father would have done anything asked of him in the future to achieve reintegration—certainly not that he would be unfit for the foreseeable future."

17

Father compares this case to *In re S.T.*, No. 121,376, 2019 WL 6795836 (Kan. App. 2019) (unpublished opinion). The father in that case, J.T., interacted well with his infant child S.T. and exhibited appropriate parenting skills. When S.T. was about three months old, J.T. was arrested and stayed in custody for several months. Upon his release, J.T. continued working on the family reunification plan. In August 2018, when S.T. was nearly a year-and-a-half old, J.T. was taken into custody again and sent to prison where he had no contact with S.T. The State moved to terminate J.T.'s parental rights, and the district court conducted a termination hearing in January 2019. At the time of the hearing, J.T. said he was scheduled to be released from prison in just over six months and the district court proceeded on this assumption. The district court then terminated J.T.'s parental rights, finding that he was unfit, the unfitness was unlikely to change in the foreseeable future, and that termination was in S.T.'s best interests.

On appeal, this court agreed with the district court's determination that J.T. was unfit at the time of the termination hearing because of his imprisonment. 2019 WL 6795836, at *3. But it disagreed with the district court's finding that J.T.'s unfitness was unlikely to change. Because J.T. was scheduled to be released from prison in six months, and his imprisonment was the basis for the unfitness finding, the condition of unfitness would not "persist sufficiently long to support termination of J.T.'s fundamental parental right." 2019 WL 6795836, at *4. Accordingly, this court reversed the district court's decision and remanded the case for further proceedings. 2019 WL 6795836, at *5.

Father argues that, like in *In re S.T.*, the issues in this case could be resolved with only "a bit more investigation and additional resources put in place." However, this case is distinct from *In re S.T.* in an important way. In *In re S.T.*, the district court believed that the condition rendering J.T. unfit would be conclusively resolved six months after the termination hearing. Here, there is not any evidence indicating that Father's unfitness, which is based in large part on Mother's unfitness, is likely to change in the foreseeable future.

18

Daugherty, one of the family's case workers, told Father as early as August 2019 that Mother would have to improve her parenting skills to serve as a caregiver to the children. And Smith, who worked with the family until November 2019, also tried to help them locate an adequate caregiver for when Father was at work. Thus, both Mother and Father were on notice that this was a problem for over a year before the termination hearing. Still, at the time of the hearing Father testified that he planned to leave H.Q. with Mother while he was at work. If Father had not rectified the issue in the year before the termination trial, the district court had a good basis to conclude that Father was unlikely to change in the foreseeable future.

"In determining whether a parent's conduct or condition is likely to change in the foreseeable future, the foreseeable future is to be considered from the child's perspective, not the parents', as time perception of a child differs from that of an adult." *In re S.D.*, 41 Kan. App. 2d 780, Syl. ¶ 9, 204 P.3d 1182 (2009). By the time the termination hearing concluded, H.Q. had been in State custody for nearly two years. Mother had been working on reintegration with her other children for over three years. She had not made any progress. Father planned to use Mother as a caretaker for H.Q. and gave no indication that his plan would change in the foreseeable future, even though case workers had been encouraging the family to make alternate arrangements for childcare for well over a year. Even though Father testified at the hearing in December 2020 that he was open to coming up with a solution to have somebody help Mother if that was necessary, he had taken no action to do so. For these reasons, the district court's findings on this point are supported by clear and convincing evidence.

*The evidence, when viewed in the light most favorable to the State, supports the district court's finding that termination of Father's parental rights was in H.Q.'s best interests.*

Finally, Father briefly argues that the district court erred when it found that termination of Father's parental rights was in H.Q.'s best interests. He notes that H.Q. was

19

"very young and had many years of childhood remaining, during which Father could continue to bond to him and be a significant part of his life."

A district court is required to determine whether termination of parental rights is in the best interests of a child, giving primary consideration to the physical, mental, and emotional health of the child. K.S.A. 2020 Supp. 38-2269(g)(1). Pursuant to this statute, district courts must "weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives." *In re K.R.*, 43 Kan. App. 2d 891, Syl. ¶ 7, 233 P.3d 746 (2010). When the district court makes this determination, it should "consider the nature and strength of the relationships between the children and parent and the emotional trauma that may be caused to the children by termination of the parental rights, weighing these considerations against a further delay in permanency for the children." 43 Kan. App. 2d 891, Syl. ¶ 7.

This court has explained the standard of review as follows:

> "If the court makes a finding of unfitness, the court then must determine whether termination of parental rights is in the best interests of the child. The district court's determination in this regard is a discretionary judgment call. On appeal, the appellate court reviews the best-interests determination for abuse of discretion. A district court abuses its discretion when no reasonable person would agree with its decision or the decision is based on a legal or factual error. If the district court makes any additional factual findings that relate solely to the best-interests determination, those findings may be made based on the preponderance of the evidence and are reviewed on appeal to see whether substantial evidence supports them." *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2.

Father does not argue that the district court made an error of law or fact, so the district court's decision on this issue should only be disturbed if no reasonable person would agree with the court's decision.

20

In this case, even though Father had a loving relationship with H.Q., that is not enough to reverse the district court's decision on this point. Father intended to stay with Mother and rely on her in caring for H.Q., but Mother was not a capable caregiver and had not progressed after more than three years of State assistance. H.Q. spent his entire life in State custody and deserved permanency and stability. The issues present at the beginning of H.Q.'s CINC case—namely Mother's inability to care for him—were still present at the time of the termination hearing. Father would not be able to safely provide for H.Q. as long as he planned to rely on Mother. For these reasons, it cannot be said that no reasonable person would agree with the district court's finding that termination of Father's parental rights was in H.Q.'s best interests.

Affirmed.